**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CLEAR; AMERICAN CIVIL LIBERTIES UNION; and AMERICAN CIVIL LIBERTIES UNION FOUNDATION,<br><br>        *Plaintiffs*,<br><br>      v.<br><br>UNITED STATES CUSTOMS AND BORDER PROTECTION,<br><br>        *Defendant*. | **COMPLAINT**<br><br>No. _____ |

## INTRODUCTION

1.     This action under the Freedom of Information Act ("FOIA") seeks to compel U.S. Customs and Border Protection ("CBP") to release records pertaining to its Tactical Terrorism Response Teams ("TTRTs"), highly secretive units that operate at U.S. ports of entry and target, detain, search, question, and/or deny entry to people with valid travel documents who present no security risk.

2.     According to the limited information available publicly, TTRT officers may target travelers, including U.S. citizens, who do not present a security risk but may hold information or have a connection to individuals of interest to the U.S. government. TTRT officers also specifically seek to target and deny entry to foreign travelers holding valid travel documents and whom the U.S. government has not previously identified as presenting a security risk. The tools, methods, and criteria TTRT officers use to determine which travelers to target for detention, search, questioning, and/or denial of entry remain secret, as are any policies and guidelines that govern TTRT activities. CBP has not publicly identified any safeguards to prevent against abuse

by TTRTs, including discriminatory profiling, interference with travelers' exercise of their First Amendment rights, or invasions of travelers' privacy.

3.     The activities of TTRTs raise serious constitutional concerns. TTRT officers may target travelers, including U.S. citizens, for detention, search, and/or questioning without a valid immigration or customs purpose and where such travelers do not present a security risk. TTRT officers may also target travelers, including U.S. citizens, based solely or primarily on their hunches. These activities increase the likelihood that TTRT officers are engaging in unlawful profiling on the basis of race, religion, ethnicity, national origin, or their proxies. It also increases the likelihood that TTRT officers are detaining, searching, and/or questioning travelers because of their speech or associations, which may be protected under the First Amendment. By subjecting travelers to such scrutiny, TTRT officers may be inappropriately recording, retaining, and disseminating their information to third parties, including other government agencies. These activities, in turn, may place travelers at risk of further government interference, such as placement on a government watchlist and additional searches, questioning, and/or detention at the border.

4.     CBP has failed to respond to Plaintiffs' request for records (the "Request") within the time period prescribed by FOIA. Plaintiffs sue to enforce their Request and inform the public about how TTRTs operate and what, if any, safeguards are in place to prevent abuse and protect individuals' rights.

## JURISDICTION AND VENUE

5.     This Court has subject matter jurisdiction over this action and personal jurisdiction over the parties pursuant to 5 U.S.C. §§ 552(a)(4)(A)(vii), (a)(4)(B), (a)(6)(E)(iii).

This Court also has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1346 and 5 U.S.C. §§ 701–706.

6.     Venue lies in the Eastern District of New York pursuant to 5 U.S.C. § 552(a)(4)(B) and 28 U.S.C. § 1391(e)(1) because it is the district in which Plaintiff Creating Law Enforcement Accountability and Responsibility Project has its principal place of business.

## PARTIES

7.     Plaintiff Creating Law Enforcement Accountability and Responsibility Project ("CLEAR") is part of Main Street Legal Services, Inc. ("MSLS"), a 26 U.S.C. § 501(c)(3) corporation incorporated in New York State and with its principal place of business in Queens, New York. MSLS is the clinical arm of the City University of New York ("CUNY") School of Law, an educational institution that operates a program of scholarly research and publication. It was created to serve the needs of individuals from marginalized communities, including Muslim, Arab, and South Asian communities, affected by policies and practices deployed under the guise of national security and counterterrorism. The impact on these communities is compounded by the secrecy surrounding these policies and practices. One of CLEAR's primary goals is therefore to educate the communities it serves on the policies and practices affecting them by widely disseminating information obtained through FOIA.

8.     Plaintiff American Civil Liberties Union ("ACLU") is a non-profit 26 U.S.C. § 501(c)(4) corporation incorporated in New York State and with its principal place of business in New York, New York. The ACLU defends the civil rights and civil liberties of all people throughout the United States and its jurisdictions and is committed to ensuring that the U.S. government complies with the Constitution and laws of this country. The ACLU is committed to protecting and empowering vulnerable and marginalized people and communities. It is also

committed to transparency and accountability in government and seeks to ensure that the public is informed about the conduct of its government in matters that affect civil liberties. Obtaining information about government activity, analyzing that information, and widely publishing and disseminating it to the press and the public is a critical and substantial component of the ACLU's work.

9.      Plaintiff American Civil Liberties Union Foundation ("ACLUF") is a separate 26 U.S.C. § 501(c)(3) corporation incorporated in New York State and with its principal place of business in New York, New York. The ACLUF educates the public about civil liberties and employs lawyers who provide legal representation free of charge in cases involving civil liberties.

10.     Defendant CBP is a component of the U.S. Department of Homeland Security ("DHS") and is an agency within the meaning of 5 U.S.C. § 552(f)(1).

## FACTUAL BACKGROUND

11.     CBP has operated TTRTs since at least 2017.

12.     TTRTs are deployed at U.S. ports of entry.

13.     TTRTs target travelers, including U.S. citizens, who are secretly placed on the government's master terrorism watchlist, known as the Terrorist Screening Database. The criteria for placement on this watchlist are vague and overbroad.

14.     TTRTs also target travelers, including U.S. citizens, who are not on any government watchlist and who do not present a security risk, for the purpose of gathering information.

15. TTRTs also target foreign travelers, who are not on any government watchlist and whom the government has not previously identified as presenting a security risk, with the purpose of denying them entry into the United States.

16. According to former CBP Commissioner and former acting Secretary of Homeland Security Kevin McAleenan, TTRTs are "a conscious effort by the Office of Field Operations . . . to take advantage of those instincts and encounters that our officers have with travelers to make decisions based on risk for people that might not be known on a watch list, might not be a known security threat, and they've been a tremendous success in identifying previously unknown individuals and in denying entry to folks that were not watch listed prior to their travel." Brian Dodwell & Paul Cruickshank, *A View from the CT Foxhole: An Interview with Kevin McAleenan, Commissioner of U.S. Customs and Border Protection*, CTC Sentinel, Sept. 2018, at 11.

17. The information TTRTs gather from travelers may be recorded, retained, and disseminated to third parties, including other government agencies. The gathering, recording, retention, and dissemination of this information may result in the placement of people, including U.S. citizens, on government watchlists.

18. In fiscal year 2017, TTRTs denied entry to the United States to more than 1,400 individuals.

19. The tools, methods, and criteria TTRT officers use to determine which travelers to target for detention, search, and/or questioning remain secret, as are any policies and guidelines that govern TTRT activities.

20. TTRT activities raise serious constitutional concerns. TTRT officers may target travelers, including U.S. citizens, for detention, search, and/or questioning without a valid

immigration or customs purpose and where such travelers do not present a security risk. TTRT officers may also rely solely or primarily on their "instincts" to target travelers, including U.S. citizens. TTRT officers also specifically target foreign travelers who possess valid travel documents and whom the government has not previously identified as presenting a security risk. Individuals applying for admission to the United States typically undergo a rigorous immigration control process, which includes security screening. Some travelers may also clear primary inspection at the border before TTRT officers detain, search, and/or question them.

21.     TTRT targeting of people who present no security risk or based on TTRT officer "instincts" increases the likelihood that TTRT officers are engaging in unlawful profiling by detaining, searching, and/or questioning travelers on the basis of their race, religion, ethnicity, national origin, or their proxies. The discriminatory targeting of specific racial and religious minority communities may, in turn, promote a climate of fear and self-censorship within these communities.

22.     TTRT targeting of people who present no security risk or based on TTRT officer "instincts" also increases the likelihood that TTRT officers are detaining, searching, and/or questioning travelers because of their speech or associations, which may be protected by the First Amendment. This interference may further chill the expression of disfavored or potentially controversial speech.

23.     The activities of TTRTs may result in the inappropriate recording, retention, and dissemination of information to third parties, including other government agencies.

24.     The activities of TTRTs implicate due process and fairness concerns because information inappropriately gathered, retained, and disseminated by TTRTs may lead to further

government scrutiny and negative consequences, including placement on a government watchlist and additional searches, questioning, and/or detention at the border.

25.     Because of concerns about abuses by TTRTs, including discriminatory profiling, violations of travelers' First Amendment rights, and infringement of travelers' privacy, the public has a strong interest in TTRT policies, practices, and procedures. Despite this public interest, very little information is available publicly about TTRTs, including how they determine which travelers to detain, search, question, and/or deny entry, the potential consequences for affected individuals, and any safeguards against abuse.

## PLAINTIFFS' FOIA REQUEST & DEFENDANT'S RESPONSE

26.     On November 7, 2019, Plaintiffs submitted the Request to CBP. A true and accurate copy of the Request is attached hereto as Exhibit A.

27.     The Request sought, *inter alia*:

> a.  Policies and guidance pertaining to TTRTs, including but not limited to records on how travelers are targeted for interview or inspection;
>
> b.  Training and/or course materials for TTRT officers;
>
> c.  Formal or informal reports, evaluations, audits, or analyses concerning the effectiveness of TTRTs; and
>
> d.  Records sufficient to show, since January 1, 2017, data related to individuals targeted for interview or inspection, denied entry, and nominated to a watchlist by TTRTs.

28.     Plaintiffs sought expedited processing of the Request on the basis that there is a "compelling need" for these records because the information requested is urgently needed by

organizations primarily engaged in disseminating information in order to inform the public about actual or alleged federal activity. *See* 5 U.S.C. § 552(a)(6)(E)(v); 6 C.F.R. § 5.5(e).

29.     Plaintiffs also sought a waiver of search, review, and duplication fees on the grounds that disclosure of the requested records is "in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of the government and is not primarily in the commercial interest of the requester[s]." *See* 5 U.S.C. § 552(a)(4)(A)(iii); 6 C.F.R. § 5.11(k). Plaintiffs further sought a waiver of search fees on the grounds that both organizations qualify as "representative[s] of the news media" and the records are not sought for commercial use. *See* 5 U.S.C. § 552(a)(4)(A)(ii)(II); 6 C.F.R. § 5.11(d)(1)).

30.     In an email dated November 14, 2019, CBP acknowledged receipt of the Request. A true and accurate copy of this email is attached hereto as Exhibit B.

31.     Under FOIA, an agency ordinarily has twenty working days to respond to a request. *See* 5 U.S.C. § 552(a)(6)(A)(i). If there are "unusual circumstances," an agency may extend the time limit by no more than ten working days. *See* 5 U.S.C. § 552(a)(6)(B)(i).

32.     Under FOIA, an agency has ten working days to respond to a request for expedited processing. *See* 5 U.S.C. § 552(a)(6)(E)(ii).

33.     Under FOIA, a person making a request is deemed to have exhausted their administrative remedies if the agency fails to comply with the applicable time limit provisions set forth in the statute. *See* 5 U.S.C. § 552(a)(6)(C)(i).

34.     To date, CBP has neither released responsive records nor explained its failure to do so.

35.     Plaintiffs have exhausted all administrative remedies because CBP has failed to comply with the time limit for responding to the Request under FOIA.

36.     CBP continues to wrongfully withhold the requested records from Plaintiffs.

## CAUSE OF ACTION

37.     Defendant's failure to make a reasonable effort to search for records responsive to the Request violates FOIA, 5 U.S.C. § 552(a)(3), and corresponding regulations.

38.     Defendant's failure to make promptly available the records sought by the Request violates FOIA, 5 U.S.C. § 552(a)(3)(A), (a)(6)(A), and corresponding regulations.

39.     Defendant's failure to process the Request expeditiously and as soon as practicable violates FOIA, 5 U.S.C. § 552(a)(6)(E), and corresponding regulations.

40.     Defendant's failure to grant Plaintiffs' request for a waiver of search, review, and duplication fees violates FOIA, 5 U.S.C. § 552(a)(4)(A)(iii), and corresponding regulations.

41.     Defendant's failure to grant Plaintiffs' request for a limitation of fees violates FOIA, 5 U.S.C. § 552(a)(4)(A)(ii)(II), and corresponding regulations.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs respectfully request that this Court:

1.     Order Defendant to immediately conduct a thorough search for all responsive records;

2.     Order Defendant to immediately process and release all responsive records;

3.     Enjoin Defendant from charging Plaintiffs search, review, or duplication fees for the processing of the Request;

4.     Award Plaintiffs their costs and reasonable attorneys' fees incurred in this action; and

5.     Grant such other relief as the Court may deem just and proper.

Dated: December 18, 2019

Respectfully submitted,

*s/ Scarlet Kim*

Christopher Dunn
Robert Hodgson
NEW YORK CIVIL LIBERTIES
    UNION FOUNDATION
125 Broad Street, 19th Floor
New York, NY 10004
(212) 607-3300 (phone)
(212) 607-3318 (fax)
cdunn@nyclu.org
rhodgson@nyclu.org

Scarlet Kim
AMERICAN CIVIL LIBERTIES UNION
    FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2500 (phone)
(212) 549-2583 (fax)
scarletk@aclu.org

*Counsel for Plaintiffs*