**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CLEAR; AMERICAN CIVIL LIBERTIES UNION; and AMERICAN CIVIL LIBERTIES UNION FOUNDATION, <br><br> *Plaintiffs*, <br><br> v. <br><br> UNITED STATES CUSTOMS AND BORDER PROTECTION, <br><br> *Defendant*. | No. 1:19-cv-07079-RER |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF
CROSS-MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Tarek Z. Ismail
CLEAR Project
CUNY School of Law
2 Court Square
Long Island City, NY 11101
(718) 340-4141
tarek.ismail@law.cuny.edu

Scarlet Kim
Patrick Toomey
American Civil Liberties Union
  Foundation
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2500
scarletk@aclu.org
ptoomey@aclu.org

Christopher Dunn
Robert Hodgson
New York Civil Liberties Union
  Foundation
125 Broad Street, 19th Floor
New York, NY 10004
(212) 607-3300
cdunn@nyclu.org
rhodgson@nyclu.org

*Counsel for Plaintiffs*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................. iv

BACKGROUND ............................................................................................................... 2

  I.  Tactical Terrorism Response Teams and Constitutional Concerns ........................... 2

  II.  The FOIA Request and CBP's Response.................................................................. 4

  III. The Withholdings at Issue ...................................................................................... 4

      A.  Training Materials................................................................................................ 5

      B.  Policies................................................................................................................ 5

      C.  Data and Statistics on TTRT Interactions with Travelers.................................... 6

      D.  Map of TTRT Locations ...................................................................................... 6

ARGUMENT ................................................................................................................... 7

  I.  CBP's Declaration Does Not Support Its Withholdings........................................... 7

      A.  CBP's Declaration Fails to Address the Challenged Withholdings........................... 8

      B.  The Vaughn Index Does Not Justify CBP's Withholdings ...................................... 10

      C.  CBP Should Not Be Permitted to Supplement Its Declaration.................................. 11

  II.  CBP IMPROPERLY WITHHELD INFORMATION UNDER EXEMPTION 7(E)....... 12

      A.  CBP Has Failed to Show that the Withheld Information Was Compiled for Law
          Enforcement Purposes ........................................................................................ 12

      B.  CBP Has Withheld Information That, By Definition, Cannot Disclose
          "Techniques and Procedures" or "Guidelines"........................................................ 15

          1.  Legal Authorities and Safeguards Cannot Disclose Techniques and Procedures
              or Guidelines ................................................................................................ 15

          2.  Data and Statistics on TTRT Interactions with Travelers Cannot Disclose
              Techniques and Procedures or Guidelines........................................................... 17

          3.  A Map of TTRT Locations Cannot Disclose Techniques and Procedures or
              Guidelines ................................................................................................... 18

      C.  CBP Has Failed to Establish that Disclosing the Withheld Information Would
          Risk Circumvention of the Law........................................................................... 19

III. CBP IMPROPERLY WITHHELD INFORMATION UNDER EXEMPTION 3............ 22

    A.  CBP Does Not Have the Authority to Invoke § 3024(i)(1) ......................................... 22

    B.  The Withheld Information Either Does Not Relate to Intelligence Sources and Methods or Has Been Officially Acknowledged ........................................................ 23

IV. CBP MUST RELEASE SEGREGABLE, NON-EXEMPT INFORMATION. ............... 25

CONCLUSION................................................................................................................. 25

APPENDIX: INDEX OF PLAINTIFFS' CHALLENGED WITHHOLDINGS............................

# TABLE OF AUTHORITIES

## Cases

*ACLU v. DHS*,
   243 F. Supp. 3d 393 (S.D.N.Y. 2017) ........................................................................ 21

*ACLU v. FBI*,
   No. 11-cv-7562, 2015 WL 1566775 (S.D.N.Y. Mar. 31, 2015) .............................. 25

*ACLU v. ODNI*,
   No. 10 Civ. 4419 (RJS), 2011 WL 5563520 (S.D.N.Y. Nov. 15, 2011) ................. 21

*Allard K. Lowenstein Int'l Human Rights Project v. DHS*,
   626 F.3d 678 (2d Cir. 2010) ............................................................................. 12, 17

*American Immigration Lawyers Assoc. v. DHS*,
   No. 16-cv-2470 (D.D.C) ............................................................................................ 8

*Bartko v. DOJ*,
   898 F.3d 51 (D.C. Cir. 2018) ............................................................................. 13, 14

*Bishop v. DHS*,
   45 F. Supp. 3d 380 (S.D.N.Y. 2014) ........................................................................ 21

*Church of Scientology, Int'l v. DOJ*,
   30 F.3d, 224 (1st Cir. 1994) ................................................................................. 8, 9

*CIA v. Sims*,
   471 U.S. 159 (1985) ................................................................................................. 22

*Cook v. Nat'l Archives & Rec. Admin.*,
   758 F.3d 168 (2d Cir. 2014) ...................................................................................... 7

*Ctr. for Nat'l Sec. Studies v. DOJ*,
   331 F.3d 918 (D.C. Cir. 2003) ................................................................................. 13

*Dep't of State v. Ray*,
   502 U.S. 164 (1991) ............................................................................................... 6, 7

*DiBacco v. U.S. Army*,
   795 F.3d 178 (D.C. Cir. 2015) ................................................................................. 23

*Doherty v. DOJ*,
   775 F.2d 49 (2d Cir. 1985) ....................................................................................... 12

*DOJ v. Tax Analysts*,
   492 U.S. 136 (1989) ........................................................................................ 7

*Elhady v. Kable*,
   391 F. Supp. 3d 562 (E.D. Va. 2019) ............................................................ 2

*Families for Freedom v. CBP*,
   797 F. Supp. 2d 375 (S.D.N.Y. 2011) ............................................... 13, 14, 17

*Grand Cent. P'ship v. Cuomo*,
   166 F.3d 473 (2d Cir. 1999) ........................................................................... 7

*Halpern v. FBI*,
   181 F.3d 279 (2d Cir. 1999) ................................................................. passim

*Jefferson v. DOJ*,
   284 F.3d 172 (D.C. Cir. 2002) ...................................................................... 13

*King v. DOJ*,
   830 F.2d 210 (D.C. Cir. 1987) .................................................................. 9, 10

*Knight First Amendment Inst. v. DHS*,
   407 F. Supp. 3d 311 (S.D.N.Y. 2019) .......................................................... 15

*Larson v. Dep't of State*,
   565 F.3d 857 (D.C. Cir. 2009) ............................................................ 7, 8, 23

*Leopold v. CIA*,
   380 F. Supp. 3d 14 (D.D.C. 2019) ............................................................... 23

*Lindsey v. FBI*,
   No. 16-2032 (CKK), 2020 WL 5593935 (D.D.C. Sept. 18, 2020) ............... 23

*Mead Data Cent. Inc. v. Dep't of Air Force*,
   566 F.2d 242 (D.C. Cir. 1977) ............................................................. 11, 25

*N.Y. Times Co. v. DOJ*,
   390 F. Supp. 3d 499 (S.D.N.Y. 2019) .......................................................... 13

*N.Y. Times Co. v. DOJ*,
   756 F.3d 100 (2d Cir. 2014) ......................................................................... 24

*Nat'l Archives & Rec. Admin. v. Favish*,
   541 U.S. 157 (2004) ........................................................................................ 6

*Navasky v. CIA*,
    499 F. Supp. 269 (S.D.N.Y. 1980) ........................................................................ 24

*NLRB v. Robbins Tire & Rubber Co.*,
    437 U.S. 214 (1978) ...................................................................................... 7, 16

*NLRB v. Sears, Roebuck & Co*,
    421 U.S. 132 (1975) .......................................................................................... 16

*Roth v. DOJ*,
    642 F.3d 1161 (D.C. Cir. 2011) ........................................................................ 13

*Sack v. CIA*,
    53 F. Supp. 3d 154 (D.D.C. 2014) .................................................................... 21

*Schwartz v. DOD*,
    No. 15-cv-7077, 2017 WL 78482 (E.D.N.Y. 2017) ......................................... 13

*Spadaro v. CBP*,
    978 F.3d 34 (2d Cir. 2020) ................................................................................ 22

*Wiener v. FBI*,
    943 F.2d 972 (9th Cir. 1991) .............................................................................. 8

*Wilner v. NSA*,
    592 F.3d 60 (2d Cir. 2009) ...................................................................... 7, 11, 22

*Wilson v. CIA*,
    586 F.3d 171 (2d Cir. 2009) .............................................................................. 24

## Statutes

5 U.S.C. § 552 ......................................................................................... 7, 12, 22, 25

50 U.S.C. § 3003 ............................................................................................... 23

50 U.S.C. § 3024 ....................................................................................... 2, 22, 23

## Other Authorities

150 Cong. Rec. H11004 (daily ed. Dec. 7, 2004) (statement of Rep. Harman) ......................... 23

ACLU of Northern California, Complaint dated Mar. 28, 2019 .................................... 3

DHS, Immigrant Classes of Admission, https://www.dhs.gov/immigration-statistics/lawful-
    permanent-residents/ImmigrantCOA (last accessed Dec. 4, 2020) ........................ 18

DHS, Nonimmigrant Classes of Admission, https://www.dhs.gov/immigrationstatistics/ nonimmigrant/NonimmigrantCOA (last accessed Dec. 4, 2020) ............................................. 18

DHS, Trusted Traveler Programs, https://ttp.dhs.gov (last accessed Dec. 4, 2020) .................... 14

E.O. No. 13470, 73 Fed. Reg. 45,325 (July 30, 2008).................................................................. 23

Hannan Adely, *Somali Man Granted Asylum: "I'm Feeling Like Somebody Who Came Back to Life Again*," Northjersey.com, July 17, 2019............................................................................. 3

Murtaza Hussain, *His Visa Was Stamped, His Papers in Order. Then He Was Targeted by a Secretive CBP Task Force*, Intercept, May 13, 2019................................................................. 3

# INTRODUCTION[1]

This Freedom of Information Act ("FOIA") lawsuit seeks records relating to Tactical

Terrorism Response Teams ("TTRTs"), which are specialized Customs and Border Protection

("CBP") units that operate at U.S. ports of entry. CBP has acknowledged that TTRTs may target

travelers who present no known security risk, including U.S. citizens, solely for the purpose of

gathering information. CBP has further acknowledged that TTRTs may target foreign travelers

arriving with valid entry documents for the purpose of denying them entry into the United States.

Since January 2017, TTRTs have targeted over 600,000 travelers, including approximately

180,000 U.S. citizens.

Despite the widespread impact of TTRTs on travelers, they remain shrouded in secrecy.

Plaintiffs filed their FOIA request (the "Request") to help the public assess whether TTRT

activities comport with constitutional and legal requirements and are subject to appropriate

oversight. Agency records describing how TTRTs impact travelers, setting out the policies that

apply to TTRTs, and discussing the legal and practical constraints governing TTRT activities are

of significant public interest. Yet CBP continues to withhold much of this basic information.

The Court should grant summary judgment in favor of Plaintiffs because CBP has failed

to justify its withholding of responsive information. First, CBP's declaration is inadequate to

justify its withholdings because it contains only broad, boilerplate assertions, rather than

engaging with the specific withholdings Plaintiffs challenge. Second, CBP cannot justify its

Exemption 7(E) withholdings because it has not met the threshold requirements for invoking this

exemption: it has not established that the withholdings were compiled for law enforcement

---

[1] The ACLU wishes to thank the students at the CLEAR Clinic at the CUNY School of Law who
provided invaluable assistance in preparing this brief: Kimberly Clay and Alexander Sullivan.

purposes, nor that releasing certain information would disclose "techniques and procedures" or "guidelines." Even if CBP could overcome these deficiencies, it has further failed to establish that disclosing the withholdings would risk circumvention of the law, which it has conceded is the standard applicable to all of the Exemption 7(E) withholdings at issue. Finally, CBP cannot justify its Exemption 3 redactions because it lacks the authority to invoke 50 U.S.C. § 3024(i)(1), which protects intelligence sources and methods, as a withholding statute. Moreover, its redactions are improper because the information is either not an intelligence source or method or has already been officially acknowledged by the government.

Accordingly, Plaintiffs respectfully request that the Court deny CBP's motion for summary judgment and grant Plaintiffs' cross-motion.

## BACKGROUND

## I.      Tactical Terrorism Response Teams and Constitutional Concerns

TTRT activities raise serious constitutional concerns. According to former Acting Secretary of Homeland Security Kevin McAleenan, the TTRT "concept was a conscious effort . . . to take advantage of those instincts and encounters that our officers have with travelers to make decisions based on risk for people that might not be known on a watch list, might not be a known security threat." Decl. of Scarlet Kim Ex. 1, at 11. The government's standards for placing people on a watchlist or identifying them as a "security threat" are broad, vague, and invite discriminatory enforcement. *See Elhady v. Kable*, 391 F. Supp. 3d 562, 580–82 (E.D. Va. 2019). TTRTs go further: officers may rely on their "instincts" to detain, search, question, and/or deny entry to travelers, *see* Kim Decl. Ex. 1, at 11–12, or to seize, search, and copy their devices, *see* Decl. of Patrick Howard Ex. H, at 3–6, 101–33. McAleenan has also acknowledged that TTRTs gather information from travelers who present *no* security risk. Kim Decl. Ex. 1, at 12.

2

By targeting travelers who present no security risk and/or based on "instincts," TTRT officers may be unlawfully profiling travelers based on their race, religion, ethnicity, and/or national origin. In December 2017, CLEAR client Abdikadir Mohamed traveled to the United States on a valid visa to meet his wife and daughter, both U.S. citizens. After Mr. Mohamed cleared immigration following inspection by four CBP officers, a TTRT officer stopped him on his way to his connecting flight. The officer's stop was based on Mr. Mohamed's national origin; his first question—before examining Mr. Mohamed's documents—was "Are you from Mogadishu?" TTRT officers ultimately denied Mr. Mohamed entry, resulting in him spending 19 months in detention while contesting his deportation. In July 2019, an immigration judge dismissed the TTRT officers' findings and granted Mr. Mohamed asylum. *See* Hannan Adely, *Somali Man Granted Asylum: "I'm Feeling Like Somebody Who Came Back to Life Again*," Northjersey.com, July 17, 2019, https://njersy.co/33Htj1Y; Murtaza Hussain, *His Visa Was Stamped, His Papers in Order. Then He Was Targeted by a Secretive CBP Task Force*, Intercept, May 13, 2019, https://bit.ly/2VF08rS. Earlier this year, a CBP directive also revealed that TTRTs were instructed to target and detain travelers, including U.S. persons, based on their national origin and to interrogate them about their religious background and beliefs. Kim Decl. Ex. 2.

TTRTs may also be targeting travelers because of their speech or associations, threatening First Amendment protections.[2] As a result, TTRTs may be improperly recording, retaining, and disseminating travelers' information to other agencies. *See* Kim Decl. Ex. 1, at 12

---

[2] In March 2019, the ACLU of Northern California filed a complaint with the Department of Homeland Security on behalf of Andreas Gal, a U.S. citizen and prominent technologist who is an outspoken critic of the Trump Administration's policies. After landing in San Francisco, Mr. Gal was detained and interrogated by TTRT officers, who focused their questions on Mr. Gal's First Amendment-protected activities and sought to search his electronic devices. ACLU of Northern California, Complaint dated Mar. 28, 2019, at 8–9, https://www.aclunc.org/docs/ACLU-NC_2019-03-28_Letter_re._Electronic_Device_Search_SFO.pdf.

("Being able to offer . . . information" gathered by TTRTs "to agency partners is [a] way we measure . . . success."). These activities may place travelers at risk of further government interference, such as inclusion on government watchlists and additional detention, searches, and questioning at the border. *See id*. (touting "watchlist nominations" as a success metric).

## II.     The FOIA Request and CBP's Response

Plaintiffs submitted the Request to CBP on November 7, 2019. Compl. Ex. A, ECF No. 1–1. The Request sought ten categories of records, including policies, guidance, and training materials on when and how TTRT officers target travelers and on the profiling of travelers based on race, religion, ethnicity, and/or national origin. The Request also sought data and statistics on TTRT interactions with travelers. *Id.* at 3–4.

After exhausting administrative remedies, Plaintiffs filed this action to compel CBP to disclose the requested records. CBP located approximately 1,726 pages of responsive records, withholding in full 851 pages, and releasing 875 pages with portions redacted. *See* Def.'s 56.1 Statement ¶¶ 7–9, 10–12. In August 2020, CBP provided Plaintiffs with a Vaughn index listing the 32 documents withheld in full. Howard Decl. ¶ 30; *id*. at Ex. M.

## III.    The Withholdings at Issue

Following CBP's productions, Plaintiffs identified a subset of the withholdings that they intended to challenge—sixteen documents withheld in full and thirteen redacted documents—which fall into four categories. Decl. of Kathleen A. Mahoney Ex. B, at 1, 5.[3]

---

[3] Plaintiffs initially identified eleven redacted documents for challenge. (Plaintiffs mistakenly numbered the documents as ten, by combining two documents.) On November 10, 2020, the parties conferred and agreed via email that Plaintiffs would address two additional redacted documents in their cross-motion: Howard Decl. Ex. D, at 10–11, 12–16. For the Court's convenience, Plaintiffs attach an appendix listing each of the challenged withholdings.

## A.    Training Materials

Training materials instruct TTRT officers on their responsibilities and duties, including when and how to target, detain, search, question, and/or deny entry to travelers. Trainings may contain guidance on relevant legal and procedural safeguards. Conversely, they may reveal the absence of safeguards, including with respect to discriminatory profiling or interference with travelers' protected speech, association, or privacy. Plaintiffs challenge the following documents:

| Documents Withheld in Full |
| --- |
| • Doc. No. 4, "Tactical Terrorism Response Team Curriculum v2," Howard Decl. Ex. M at 2; |
| • Doc. No. 9, "2. CTD TTRT101," *id*. at 7; |
| • Doc. No. 11, "Culture and Religious Awareness Class," *id*. at 9; |
| • Doc. No. 14, "CND 101_20200205," *id*. at 12; |
| • Doc. No. 15, "CTD 10 TTRT Orientation 20200304," *id*.; |
| • Doc. No. 28, "TTP_[redacted] Presentation," *id*. at 22; |
| • Doc. No. 32, "Enhanced Communication Course," *id*. at 25. |
| **Redacted Documents** |
| • "TTRT – Tactical Terrorism Response Team," Howard Decl. Ex. H at 20; |
| • PowerPoint, "Tactical Terrorism Response Team – [redacted]," *id*. at 22–30; |
| • PowerPoint, "Welcome to the [redacted] TTRT presentation," *id*. at 43–61; |
| • PowerPoint, "[redacted]," *id*. at 62–80. |

## B.    Policies

Policies guide TTRT officers in carrying out their responsibilities and duties. Like trainings, policies may also guide TTRT officers on relevant legal and procedural safeguards or reveal the absence of such safeguards. Plaintiffs challenge the following documents:

| Documents Withheld in Full |
| --- |
| • Doc. No. 5, "TTRT Officer Reference Job Aid 2020," Howard Decl. Ex. M at 3; |
| • Doc. No. 16, "Memorandum – Importance of Targeting Rules," *id*. at 13; |
| • Doc. No. 18, "Muster – Updated Guidance [redacted]," *id*. at 15; |
| • Doc. No. 19, "Nomination Referrals," *id*. at 16; |
| • Doc. No. 27, "TOC Watchlisting Overview," *id*. at 21; |
| • Doc. No. 29, "TTRT [redacted] SOP [redacted] BSI 2018," *id*. at 23. |

| Redacted Documents |
| --- |
| • CBP Directive No. [redacted], "Passenger Analytical Unit Procedures for Targeting High-Risk Travelers," Howard Decl. Ex. H at 7–19; |
| • Area Port of [redacted] Standard Operating Procedures, "Tactical Terrorism Response Team (TTRT)," *id.* at 32–35; |
| • Memorandum, "Tactical Terrorism Response Team Responsibilities," *id.* at 40–42; |
| • "Watchlisting Reference Guide," *id.* at 86–93. |

### C. Data and Statistics on TTRT Interactions with Travelers

In this category, Plaintiffs challenge the following documents:

| Documents Withheld in Full |
| --- |
| • Doc. No. 1, "Encounters at Ports of Entry Identify Individuals with Potential Links to International Terrorism," Howard Decl. Ex. M at 1; |
| • Doc. No. 30, "TTRT [redacted] Accomplishments," *id.* at 24. |

| Redacted Documents |
| --- |
| • TTRT Refusals by Port of Entry, Howard Decl. Ex. D at 10–11; |
| • TTRT Encounters by Port of Entry, *id.* at 12–16; |
| • TTRT Encounters by Class of Admission, Howard Decl. Ex. F at 1–3; |
| • TTRT Withdrawals by Port of Entry, *id.* at 4–7; |
| • TTRT Expedited Removals by Port of Entry, *id.* at 8; |
| • "TTRT – Tactical Terrorism Response Team," Howard Decl. Ex. H at 20; |
| • Slide in PowerPoint, "Welcome to the [redacted] TTRT presentation," *id.* at 52. |

### D. Map of TTRT Locations

This category consists of a single document withheld in full: Doc. No. 10, "Map of TTRT Locations." Howard Decl. Ex. M at 8.

## LEGAL STANDARDS

Congress enacted FOIA "to pierce the veil of administrative secrecy and to open agency action to the light of public scrutiny." *Dep't of State v. Ray*, 502 U.S. 164, 273 (1991). FOIA provides "a means for citizens to know 'what their Government is up to.' This phrase should not be dismissed as a convenient formalism. It defines a structural necessity in a real democracy." *Nat'l Archives & Rec. Admin. v. Favish*, 541 U.S. 157, 171–72 (2004). FOIA therefore dictates a "strong presumption . . . of disclosure." *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214,

236 (1978).

The agency bears the burden of demonstrating that withheld information falls within the claimed exemptions. *Ray*, 502 U.S. at 173. On a motion for summary judgment, "[t]he burden is on the agency to demonstrate, not the requester to disprove, that the materials . . . have not been improperly withheld." *DOJ v. Tax Analysts*, 492 U.S. 136, 142 n.3 (1989). Courts review the legality of withholdings *de novo*. Consistent with FOIA's presumption of public access, courts "construe FOIA exemptions narrowly, resolving doubts in favor of disclosure." *Cook v. Nat'l Archives & Rec. Admin.*, 758 F.3d 168, 173 (2d Cir. 2014). Even where an agency has properly invoked an exemption, it may only withhold those specific "portions which are exempt," and must provide "[a]ny reasonably segregable portion of a record." 5 U.S.C. § 552(b).

## ARGUMENT

### I.     CBP's Declaration Does Not Support Its Withholdings.

An agency may meet its burden to justify its withholdings "by submitting a detailed affidavit showing that the information logically falls within the claimed exemptions." *Wilner v. NSA*, 592 F.3d 60, 68 (2d Cir. 2009). The affidavit must "describe the justifications for nondisclosure with reasonably specific detail" and demonstrate that those justifications "are not controverted by . . . contrary evidence in the record." *Id*. at 73 (quoting *Larson v. Dep't of State*, 565 F.3d 857, 862 (D.C. Cir. 2009)); *see also Grand Cent. P'ship v. Cuomo*, 166 F.3d 473, 478 (2d Cir. 1999) (affidavit must "contain *reasonable specificity* of detail rather than merely conclusory statements"). A "vague or sweeping" affidavit, or one that rests predominantly on a recitation of "statutory standards," is insufficient. *Larson*, 565 F.3d at 864. Rather, "an agency's response must logically fit the particular facts and circumstances of the case." *Id*. at 868.

7

## A. CBP's Declaration Fails to Address the Challenged Withholdings.

CBP's declaration does not carry the agency's burden for a simple reason: it is completely untethered from the withholdings Plaintiffs challenge. *See Halpern v. FBI*, 181 F.3d 279, 293 (2d Cir. 1999) (agency failed to sustain burden where "[t]he affidavit . . . barely pretend[s] to apply [an exemption] to the specific facts of the documents at hand"); *see also Church of Scientology, Int'l v. DOJ*, 30 F.3d, 224, 231 (1st Cir. 1994) (declaration that failed to "refer[ ] to specific documents" was inadequate); *Wiener v. FBI*, 943 F.2d 972, 977–79 (9th Cir. 1991) ("boilerplate" explanations with "[n]o effort . . . to tailor the explanation to the specific document withheld" were insufficient). As CBP acknowledges, Plaintiffs have identified the specific withholdings they challenge. *See* Mem. in Supp. of Def.'s Mot. for Summ. J. 6 ("Def.'s MSJ"). Yet, with the exception of a single record, CBP's declaration fails to even mention these withholdings, let alone explain how the claimed exemptions apply to them. At the same time, the declaration invokes exemptions—5, 6, and 7(C)—that Plaintiffs stated they have no intention of challenging. *See* Howard Decl. ¶¶ 32–42; Mahoney Decl. Ex. B, at 1. CBP's declaration does not "logically fit the particular facts and circumstances of the case" because it declines even to engage with those very facts and circumstances. *Larson*, 565 F.3d at 868.

Exemption 7(E) is the sole exemption CBP claims for all of its challenged withholdings save one. Rather than engage specifically with these withholdings, CBP's declaration identifies six broad categories of information subject to Exemption 7(E), and then asserts that any information falling into those categories is subject to the exemption. Howard Decl. ¶ 45. In fact, CBP appears to have essentially copied-and-pasted the same language it offered to justify its withholdings in a separate FOIA case, *American Immigration Lawyers Assoc. v. DHS*, No. 16-cv-2470 (D.D.C), involving entirely different records, *compare* Howard Decl. ¶ 45 *with*

8

Kim Decl. Ex. 3 at ¶ 21. The folly of CBP's approach is further illustrated by the mismatch between some of the challenged withholdings and CBP's own categories. For example, Plaintiffs have identified a set of withholdings, including two in the Vaughn index, containing data and statistics related to TTRTs. *See supra* at 6. But these withholdings do not fall logically within any of CBP's categories. Ultimately, CBP admits that its categories do "not purport to be an all-inclusive rendering of all withheld information." Howard Decl. ¶ 43.[4]

CBP claims that other courts have "concluded, in similar circumstances, that CBP chose a legitimate way to describe the basis for its withholdings." Def.'s MSJ 13 (citing one case from D.D.C.). But multiple courts of appeal, including the Second Circuit, have rejected similar agency attempts to rely on broad categorical descriptions to justify its exemptions. *See Halpern*, 181 F.3d at 293 (rejecting affidavit that failed to discuss "the specific facts of the documents at hand" and citing cases from the First, Third, Ninth, and D.C. Circuits); *Church of Scientology*, 30 F.3d at 231 (rejecting declarations that "treat the documents within various exemption categories as a group, without referring to specific documents"); *King v. DOJ*, 830 F.2d 210, 219-25 (D.C. Cir. 1987) ("Categorical description of redacted material coupled with categorical indication of anticipated consequences of disclosure is clearly inadequate."). CBP's declaration takes an approach rejected by the Second Circuit and four other appellate courts and is therefore plainly inadequate to justify its withholdings.[5]

---

[4] Perhaps because its justifications float untethered from any specific withholding, the declaration engages in patently circular reasoning. For example, at one point, CBP asserts that "information regarding . . . investigative techniques and procedures would advise potential violators of CBP's law enforcement techniques and procedures . . . ." Howard Decl. ¶ 44.

[5] The declaration's invocation of Exemption 3, which applies only to a single record withheld in part, is also far too vague and conclusory to carry the government's burden. *See infra* at 22 n.14.

**B.      The Vaughn Index Does Not Justify CBP's Withholdings.**

CBP's Vaughn index does not save the agency's inadequate declaration. First, the index describes only the documents withheld in full. For the redacted documents, CBP has offered "no contextual description either of the documents subject to redaction or of the specific redactions made to the various documents." *Halpern*, 181 F.3d at 293; *see King*, 830 F.2d at 223 ("A withholding agency must describe *each* document or portion thereof withheld, and for *each* withholding it must discuss the consequences of disclosing the sought-after information."). Thus, CBP offers no justification whatsoever for the redactions in the documents withheld in part.[6]

Second, the Vaughn index itself consists of vague and conclusory statements that do not logically explain CBP's invocation of Exemption 7(E). In many instances, CBP merely repeats the language of the exemption and uses a string of generic words to describe a document. *See, e.g.*, Howard Decl. Ex. M, at 13, 15–16, 21–22 (exemption applied to "information explaining law enforcement techniques and procedures, including information related to how CBP addresses certain threats"). These descriptions fall far short of the requirement that CBP "describe with reasonable specificity the nature of the documents at issue." *Halpern*, 181 F.3d at 291. CBP's justifications for its withholdings are also conclusory, relying on the same boilerplate claim:

> Disclosure of law enforcement techniques and procedures . . . would be debilitating and detrimental to both CBP and the law enforcement community, and it would enable individuals to alter their patterns of conduct, adopt new methods of operation, relocate, change associations, and effectuate other countermeasures, thereby corrupting the integrity of ongoing investigations.

Howard Decl. Ex. M, at 2–4, 7–9, 12–13, 15–16, 21–23, 25*; see also id*. at 1, 24.

CBP's offer to provide "additional information" to the Court "in an ex parte submission"

---

[6] The declaration does discuss one redacted record, the Watchlisting Reference Guide. Howard Decl. ¶ 51. However, it discusses only CBP's invocation of Exemption 3, even though CBP also invokes Exemption 7(E) over the same material.

is improper. *See* Def.'s MSJ 13. The courts "are mindful of our legal system's preference for open court proceedings." *Wilner*, 592 F.3d at 76. In the FOIA context, the Second Circuit has explained that "[a] court should only consider information *ex parte* and *in camera* that the agency is unable to make public if questions remain after the relevant issues have been identified by the agency's public affidavits and have been tested by plaintiffs." *Id.* at 75–76. Here, CBP's failure to tailor its affidavit to the specific withholdings at issue means it has not identified "the relevant issues" and has obstructed Plaintiffs' ability to meaningfully dispute those issues. Accordingly, *ex parte* submissions cannot be justified at this stage of the litigation.

### C.   CBP Should Not Be Permitted to Supplement Its Declaration.

CBP may attempt to correct the wholesale deficiencies in its original declaration by asserting new facts at the reply stage. The Court should not permit this tactic here, where it is fundamentally unfair and subverts the adversary process.[7] As the Second Circuit has recognized, the agency declaration enables "the adversary system to operate by giving the requester as much information as possible, on the basis of which he can present his case to the trial court." *Halpern*, 181 F.3d at 291. "Absent a sufficiently specific explanation from an agency, a court's *de novo* review is not possible and the adversary process envisioned in FOIA litigation cannot function." *Id*. at 295; *see Mead Data Cent. Inc. v. Dep't of Air Force*, 566 F.2d 242, 251 (D.C. Cir. 1977) (Plaintiff cannot be "deprived of the opportunity to effectively present its case . . . because of the agency's inadequate description of the information withheld and exemptions claimed."). Plaintiffs identified their challenged withholdings to CBP months ago, and CBP forfeited its

---

[7] The only exception, if any, should be for the two redacted datasets that Plaintiffs have added to their challenge with CBP's consent. *See supra* at 4 n.3. In fact, because these datasets are similar to two datasets that Plaintiffs originally identified for challenge, CBP should have already put forward its basis for withholding information of this kind. *See infra* at 17 & n.9.

opportunity to respond with the specificity required by law. CBP has forced Plaintiffs to craft their arguments without the information necessary to fully present their case to the Court. It would be unfair—and detrimental to the adversary process—to allow CBP to play such games.

## II.     CBP IMPROPERLY WITHHELD INFORMATION UNDER EXEMPTION 7(E).

To fall within Exemption 7(E), withheld information must first meet the threshold requirement that it was "compiled for law enforcement purposes." 5 U.S.C. § 552(b)(7). It must then fall into one of two categories protected by the exemption. The first category, techniques and procedures, "refers to how law enforcement officials go about investigating a crime," *Allard K. Lowenstein Int'l Human Rights Project v. DHS*, 626 F.3d 678, 682 (2d Cir. 2010), but only to the extent such techniques and procedures are "not generally known to the public," *Doherty v. DOJ*, 775 F.2d 49, 52 n.4 (2d Cir. 1985). The second category, guidelines, comprises information providing "an indication or outline of future policy or conduct" implicating "resource allocation." *Lowenstein*, 626 F.3d at 682. Exemption 7(E) exempts guidelines from disclosure "only if public access to [them] would risk circumvention of the law." *Id*. at 681.

Even if CBP's declaration addressed the challenged withholdings with the required specificity, the agency's reliance on Exemption 7(E) is wrong. First, CBP has not established that its withholdings were compiled for law enforcement purposes. Second, certain categories of the withholdings cannot, by their very nature, disclose techniques and procedures or guidelines. Finally, CBP has failed to establish that disclosing this information would risk circumvention of the law, which it has conceded is the standard applicable to all of the withholdings.

### A.     CBP Has Failed to Show that the Withheld Information Was Compiled for Law Enforcement Purposes.

As a threshold matter, CBP "bears the burden of demonstrating that the . . . information withheld w[as] 'compiled for law enforcement purposes.'" *Schwartz v. DOD*, No. 15-cv-7077,

2017 WL 78482 at *12 (E.D.N.Y. 2017). "The law-enforcement-purpose inquiry focuses 'on how and under what circumstances the requested files were compiled,' and 'whether the files sought relate to anything that can fairly be characterized as an enforcement proceeding." *Bartko v. DOJ*, 898 F.3d 51, 64 (D.C. Cir. 2018) (quoting *Jefferson v. DOJ*, 284 F.3d 172, 176–77 (D.C. Cir. 2002))); *Schwartz*, 2017 WL 78482 at *13. Thus, "an agency must establish 'a rational nexus between the investigation and one of the agency's law enforcement duties,' and 'a connection between an individual or incident and a . . . violation of federal law." *Bartko*, 898 F.3d at 64 (quoting *Ctr. for Nat'l Sec. Studies v. DOJ*, 331 F.3d 918, 926 (D.C. Cir. 2003)); *see also N.Y. Times Co. v. DOJ*, 390 F. Supp. 3d 499, 514 (S.D.N.Y. 2019) ("[C]ourts have generally interpreted Exemption 7 as applying to records that pertain to specific investigations conducted by agencies . . . .").

CBP does not even attempt to satisfy this test. Rather, CBP claims that, by virtue of its mandate, all contested documents are *per se* compiled for law enforcement purposes. Def.'s MSJ 9 ("CBP satisfies the threshold requirement of Exemption 7(E). CBP is a law enforcement agency . . . ."). The courts have resoundingly rejected such an argument. Even where the agency is "unquestionably a federal law enforcement agency, not every document produced by [agency] personnel has been 'compiled for law enforcement purposes' under FOIA." *Families for Freedom v. CBP*, 797 F. Supp. 2d 375, 397 (S.D.N.Y. 2011); *see Roth v. DOJ*, 642 F.3d 1161, 1173 (D.C. Cir. 2011) ("FBI records are not law enforcement records under FOIA simply by virtue of the function that the FBI serves."). Notwithstanding that CBP is a law enforcement agency, it must still establish that "the *documents in question* constitute the types of records" that Exemption 7(E) is "intended to protect." *Families for Freedom*, 797 F. Supp. 2d at 397 (emphasis added).

13

Neither the declaration nor the Vaughn index establish that the withholdings were compiled for law enforcement purposes. As discussed above, the declaration fails to address CBP's application of Exemption 7(E) to any of the challenged withholdings and, thus, necessarily fails to establish that those specific withholdings were compiled for law enforcement purposes. The Vaughn index is also deficient, robotically asserting that it contains "information explaining law enforcement techniques and procedures." *See* Howard Decl. Ex. M, at 3, 7–9, 12–13, 15–16, 21–23, 25. This justification merely parrots the required standard without explaining *why* CBP compiled the withholdings. These bald assertions do not meet the agency's burden.

Many of the withholdings also bear no rational relationship to any law enforcement purpose. The most glaring example is CBP's withholding of certain training materials, including Doc. No. 11, "Culture and Religious Awareness Class," and Doc. No. 28, "TTP_[redacted] Presentation." Howard Decl. Ex. M, at 9, 22. CBP clearly compiled the first document for the purpose of training TTRT officers on cultural and religious competence, which does not "relate to anything that can fairly be characterized as an enforcement proceeding" or investigation. *Bartko*, 898 F.3d at 65. The second document discusses the Trusted Traveler Programs, which permit certain travelers to use expedited lanes at U.S. airports, and are not remotely relevant to a law enforcement purpose. *See* DHS, Trusted Traveler Programs, https://ttp.dhs.gov (last accessed Dec. 4, 2020). Many of the withheld policies also do not appear to be compiled for law enforcement purposes, either because they are "directives regarding the general execution of tasks by agency personnel," *Families for Freedom*, 797 F. Supp. 2d at 396–97, or  "descriptions of codified law and policy," which even if they include "interpretation and application of . . . laws and regulations, are not protected under Exemption 7(E)," *Knight First Amendment Inst. v.*

14

*DHS*, 407 F. Supp. 3d 311, 333 (S.D.N.Y. 2019). The "TTRT Officer Reference Job Aid 2020,"

for example, appears to be a directive "regarding the general execution of tasks" by TTRT

officers. And the memorandum on the "Importance of Targeting Rules," by the use of the word

"Rules" in the title, indicates that it contains descriptions of codified law or policy.

> **B.     CBP Has Withheld Information That, By Definition, Cannot Disclose "Techniques and Procedures" or "Guidelines."**

Even if CBP can establish that its withholdings were compiled for law enforcement

purposes, it cannot withhold three categories of information because they cannot disclose

techniques and procedures or guidelines: (1) legal authorities and safeguards governing TTRT

activities, (2) data and statistics on TTRT interactions with travelers, and (3) a map of TTRT

locations.

> **1.     Legal Authorities and Safeguards Cannot Disclose Techniques and Procedures or Guidelines.**

CBP has invoked Exemption 7(E) to withhold descriptions of legal authorities and

safeguards. As discussed above, this information does not meet the threshold requirement that it

be "compiled for law enforcement purposes." *See Knight*, 407 F. Supp. 3d at 333 ("The mere

descriptions of codified law and policy, even those including 'interpretation and application

of . . . laws and regulations,'" are not protected under Exemption 7(E)."). Even if it met this

threshold, this information, by its very nature, cannot disclose techniques and procedures or

guidelines.

Two sets of examples illustrate this point. First, CBP repeatedly redacted policy

documents describing the legal authorities that apply to TTRT activities. For example, CBP

redacted information in a Directive that appears under the header "Authority/References" and

sets out a mix of statutes and CBP policies. Howard Decl. Ex. H, at 9–10. Similarly, CBP

redacted information on a page in the Watchlisting Reference Guide entitled, "Watchlisting Authorities and Protections," which describes relevant statutes and Executive Orders. *Id.* at 91. Second, CBP redacted portions of documents describing the safeguards TTRTs must employ when carrying out their duties. Thus, in a section of the Watchlisting Reference Guide, CBP redacted a bullet point where the surrounding text includes safeguards such as "First Amendment protected activity alone shall not be the basis for nominating an individual for inclusion in the TSDB." *Id*. Likewise, CBP redacted information in a January 2017 memo, which appears to instruct TTRT officers on various substantive and procedural requirements when searching and questioning travelers—including instructions regarding personal searches and the use of force, *id.* at 33, and rules regarding border searches of electronic devices, *id*. at 33–34.[8]

Neither the legal authorities governing TTRTs nor the safeguards TTRTs employ when conducting their duties can be subject to Exemption 7(E). They neither divulge how TTRTs conduct investigations (techniques and procedures) nor indicate the future direction of TTRT policy (guidelines). Critically, FOIA is especially hostile to efforts to withhold information constituting the rules under which agencies operate. As the Supreme Court has observed, FOIA "represents a strong congressional aversion to 'secret (agency) law,' and . . . an affirmative congressional purpose to require disclosure of documents which have 'the force and effect of law.'" *NLRB v. Sears, Roebuck & Co*, 421 U.S. 132, 153 (1975). A citizenry ignorant of the rules governing agencies, including the guardrails that protect against abuses, cannot "hold the governors accountable to the governed." *Robbins Tire & Rubber Co.*, 437 U.S. at 242. Plaintiffs

---

[8] It is likely that legal authorities and safeguards are contained in other policies and training materials that CBP withheld in full and in part. For example, a training slide in a partially redacted PowerPoint states in giant letters, "Without a Warrant," suggesting the document addresses the standard by which TTRT officers may search travelers. Howard Decl. Ex. H, at 57.

submitted the Request precisely because of concerns that TTRTs may lack sufficient safeguards, leading to abuses. *See* Compl. ¶¶ 2–4, ECF No. 1.

2.      **Data and Statistics on TTRT Interactions with Travelers Cannot Disclose Techniques and Procedures or Guidelines.**

Nine CBP withholdings contain data and statistics on TTRT interactions with travelers.

**Ports of entry**. Four withholdings are datasets listing TTRT encounters by port of entry, where CBP has redacted only the names of the ports of entry.[9] This information cannot disclose techniques and procedures because it provides no insight into how TTRTs conduct investigations. Rather, as part of the overall dataset, it simply indicates the number of times TTRTs encountered travelers at each port of entry. *See Families for Freedom*, 797 F. Supp. 2d at 391 ("the total number of all arrests made" by a particular CBP station cannot be a technique or procedure). Similarly, the redacted information cannot disclose a guideline. A retrospective tally of the number of times TTRTs encountered travelers at each port of entry reveals no "outline of future policy or conduct." *Lowenstein*, 626 F.3d at 682; *see Families for Freedom*, 797 F. Supp. 2d at 391–93.

**Classes of admission**. A fifth document is a redacted dataset pertaining to TTRT encounters by class of admission. Howard Decl. Ex. F, at 1–3. Here, CBP has redacted certain classes of admission and the number of TTRT encounters by each class. Neither type of information can disclose techniques and procedures or guidelines. Classes of admission refer to the various avenues by which travelers may enter the United States and therefore have no

---

[9] (1) TTRT Refusals by Port of Entry, Howard Decl. Ex. D, at 10–11; (2) TTRT Encounters by Port of Entry, *id*. at 12–16; (3) TTRT Withdrawals by Port of Entry, Howard Decl. Ex. F, at 4–7; (4) TTRT Expedited Removals by Port of Entry, *id*. at 8.

bearing on how TTRTs conduct investigations or plan to implement future policy.[10]

**Exams of travelers**. Two more redacted documents contain statistics about the annual number of TTRT "exams" of travelers, plus two other statistics redacted in full. Howard Decl. Ex. H, at 20, 52. Just as the total number of TTRT "encounters" with travelers cannot disclose TTRT methods or future policy, neither can the total number of TTRT exams. Moreover, CBP's disclosure of the total number of TTRT encounters suggests there is nothing sensitive about the number of TTRT exams, which are just a subset of TTRT encounters. As for the statistics redacted in full, CBP has provided no description of this information, let alone a justification for their redaction.

Finally, CBP withheld in full two documents containing "statistics and data related to terrorism linked inspections," including the "location of inspection."[11] This description is much too vague to permit a determination of whether the information falls under Exemption 7(E). But what little Plaintiffs can glean suggests that these documents contain data similar to the data discussed above, and thus this information cannot be withheld for the same reasons.

### 3. A Map of TTRT Locations Cannot Disclose Techniques and Procedures or Guidelines.

CBP has also improperly withheld a map of TTRT locations. Howard Decl. Ex. M, at 8. A geographic illustration of where TTRTs operate cannot reveal the tactics TTRTs employ to conduct investigations (techniques and procedures) or a future policy TTRTs plan to implement

---

[10] In addition, the classes of admission are public information and therefore cannot be covered by Exemption 7(E). *See* DHS, Nonimmigrant Classes of Admission, https://www.dhs.gov/immigration-statistics/nonimmigrant/NonimmigrantCOA (last accessed Dec. 4, 2020); DHS, Immigrant Classes of Admission, https://www.dhs.gov/immigration-statistics/lawful-permanent-residents/ImmigrantCOA (last accessed Dec. 4, 2020).

[11] (1) Doc. No. 1 "Encounters at Ports of Entry Identify Individuals with Potential Links to International Terrorism," Howard Decl. Ex. M, at 1, and (2) Doc. No. 30 "TTRT [redacted] Accomplishments," *id.* at 24.

(guidelines). Even if a map could disclose tactics or future policy, CBP has already disclosed

where TTRTs operate—at the nation's 46 largest ports of entry—so Exemption 7(E) cannot

apply to this information. Kim Decl. Ex. 4, at 12; *see also* Kim Decl. Ex. 5 at 5, 16, 21, 28. CBP

must therefore disclose the map.[12]

### C.     CBP Has Failed to Establish that Disclosing the Withheld Information Would Risk Circumvention of the Law.

Even if CBP had met the basic requirements of Exemption 7(E), it has failed to show that

disclosing any of the withheld information would risk circumvention of the law. In its brief, CBP

claims that it is unable to "differentiate" between "techniques and procedures" and

"guidelines"—and it therefore opts to treat *all* the withholdings as guidelines by discussing

"risk . . . with respect to all withheld records and information." Def.'s MSJ 13 n.5.[13] After

conceding that this higher standard applies to all of its withholdings, CBP consistently fails to

demonstrate the existence of any such risk. Ultimately, CBP abandons any pretense of applying

the risk standard with a blanket assertion: "[t]he application of Exemption 7(E) is 'self-evident.'"

Def.'s MSJ 15.

CBP cannot prevail on this basis. In many instances, CBP does not provide even a basic

description of the withheld information, making it impossible to discern what risk, if any,

disclosing such information would invite. *See supra* at 8–9. Nevertheless, the context of some of

the redactions makes clear that the obscured information would not risk circumvention of the

law. Many of the trainings and policies withheld in part contain broad, high-level descriptions of

---

[12] For the same reasons, CBP must disclose information relating to the location of TTRTs, which appear across a number of the withholdings. *See, e.g.*, Howard Decl. Ex. M, at 7, 12, 24.

[13] The Vaughn index describes nearly every withheld document as containing "techniques and procedures." But because CBP has explicitly conceded that it cannot "differentiate" between techniques and procedures and guidelines, the Court should not accord CBP's use of the descriptive "techniques and procedures" any weight.

TTRT responsibilities and duties, which CBP has redacted. One telling illustration comes from comparing the agency's inconsistent redactions in a document produced twice to Plaintiffs:

| **Version 1**, Howard Decl. Ex. H at 20 | **Version 2**, Howard Decl. Ex. H at 51–52 |
|---|---|
| "Utilizing skillsets that [REDACTED] TTRT members are tasked with responding to and effectively countering current and evolving U.S. National Security threats." | "Utilizing skillsets that **focus on enhanced interviewing techniques, analytics, and media exploitation**, TTRT members are tasked with responding to and effectively countering current and evolving U.S. National Security threats." |
| "Examine and interview travelers [REDACTED]." | "Examine and interview travelers **known or suspected of having a nexus to terrorism at and in between POEs**." |
| "Review, prioritize, and operationalize [REDACTED]." | "Review, prioritize, and operationalize **sensitive and classified information and intelligence**." |

Disclosing broad descriptions of "skillsets" such as "enhanced interviewing techniques, analytics, and media exploitation" does not risk circumvention of the law. Nor can general descriptions of duties such as "interview[ing] travelers . . . suspected of having a nexus to terrorism" or "review[ing] . . . classified information." The context of other redactions indicate that CBP has improperly withheld similarly generic information that would not risk circumvention of the law. *See, e.g.* Howard Decl. Ex. H, at 25, 32–33, 40–41, 46, 50, 53, 55–56, 58–61, 79.

CBP similarly fails to establish that disclosing the documents withheld in full would risk circumvention of the law. The Vaughn index descriptions are far too vague and conclusory to determine whether disclosing these documents would create such a risk. In some cases, the index states nothing more than the document contains "techniques and procedures," as if the mere incantation of these words were enough to withhold information. *See, e.g.*, Howard Decl. Ex. M, at 7, 12 ("information explaining law enforcement techniques and procedures, enforcement unit structures, and chains of command"). In addition, the index does not explain what risk disclosing

the withheld documents would entail. It recites, with minor deviations, the same boilerplate language for every withheld document. *See supra* at 10. But "[c]ourts require the government to offer more than 'generic assertions' and 'boilerplate' to justify Exemption 7(E) withholding." *ACLU v. DHS*, 243 F. Supp. 3d 393, 403 (S.D.N.Y. 2017). Thus in *ACLU v. Office of the Director of National Intelligence*, No. 10 Civ. 4419 (RJS), 2011 WL 5563520, at *11 (S.D.N.Y. Nov. 15, 2011), the court rejected an agency's "generic assertion that disclosure 'could enable targets . . . to avoid detection or develop countermeasures to circumvent' law enforcement efforts." *See also Halpern*, 181 F.3d at 292–93, 301 (finding "insufficient" explanation that redactions would "cause damage to the national security" because "hostile entities" could "develop countermeasures").

To paper over the deficiencies in the declaration and the Vaughn index, CBP cites to various cases, which purportedly establish that the withholdings are proper. For example, it cites to *Bishop v. Department of Homeland Security*, 45 F. Supp. 3d 380 (S.D.N.Y. 2014), for the proposition that "[c]ourts have routinely protected law enforcement documents that contain information used for the purpose of identifying potential targets of investigations." Def.'s MSJ 16. CBP significantly overstates *Bishop*, which held that an agency had properly *redacted* information revealing *data fields* resulting from *specific searches* on the CBP TECS system and Automated Targeting System. *Bishop*, 45 F. Supp. 3d at 385. None of the withholdings here are analogous to this information. CBP also cites to *Sack v. CIA*, 53 F. Supp. 3d 154 (D.D.C. 2014) for the proposition that "[c]ourts have . . . upheld the assertion of Exemption 7(E) to withhold information . . . that could provide information about vulnerabilities concerning law enforcement techniques and contribute to circumvention." Def.'s MSJ 16. But *Sack* concerned the protection of polygraph technology, which is not at issue here. *Sack*, 53 F. Supp. 3d at 174–75.

### III.   CBP IMPROPERLY WITHHELD INFORMATION UNDER EXEMPTION 3.

Under Exemption 3, an agency may withhold information that is "specifically exempted from disclosure by [a] statute" other than FOIA. 5 U.S.C. § 552(b)(3). Courts evaluate the invocation of Exemption 3 using a two-pronged approach. "First, the court must consider whether the statute identified by the agency is a statute of exemption as contemplated by Exemption 3. Second, the court must consider whether the withheld material satisfies the criteria of the . . . statute." *Wilner*, 592 F.3d at 72 (quoting *CIA v. Sims*, 471 U.S. 159, 167 (1985)).

Here, CBP withheld portions of the Watchlisting Reference Guide, an unclassified document, by citing 50 U.S.C. § 3024(i)(1), which exempts "intelligence sources and methods from unauthorized disclosure." When § 3024(i)(1) is properly invoked, it is a withholding statute under Exemption 3. But CBP fails the second prong of the test—demonstrating that the withheld information satisfies the criteria of § 3024(i)(1). CBP has no authority to invoke § 3024(i)(1), and the withheld information either does not relate to intelligence sources and methods or has already been officially acknowledged.[14]

### A.   CBP Does Not Have the Authority to Invoke § 3024(i)(1).

The plain language of 50 U.S.C. § 3024(i)(1) authorizes the "Director of National Intelligence" ("DNI") to protect "intelligence sources and methods from unauthorized disclosure." *See Spadaro v. CBP*, 978 F.3d 34, 46 (2d Cir. 2020) ("When interpreting a statute, we begin with the plain language . . . giving the statutory terms their ordinary or natural meaning.").[15] Here, the DNI has not filed a declaration invoking § 3024(i)(1) to withhold

---

[14] CBP's declaration is also baldly inadequate with respect to Exemption 3. It merely asserts that "certain information contained in the document was exempt . . . under 50 U.S.C. § 3024(i)(1)" and then recites the language of the statute. Howard Decl. ¶ 51. These generic assertions are insufficient to demonstrate why the withheld information falls within the statute's coverage.

[15] Congress's purpose in drafting § 3024(i) was to "consolidate[e] power within the DNI in order

22

portions of the Watchlisting Reference Guide. Rather, CBP's declaration simply states that "[f]ollowing consultations between CBP and ODNI, *it was determined* that certain information contained in this document was exempt from disclosure pursuant to . . . Exemption (b)(3) under 50 U.S.C. [§] 3024(i)(1)." Howard Decl. ¶ 51 (emphasis added). CBP may not invoke § 3024(i)(1) on behalf of the DNI, and its vague assertion cannot override the plain language of the statute.

Nor can CBP invoke § 3024(i)(1) itself. Some courts have permitted intelligence agencies to invoke this provision over properly classified information. *See, e.g.*, *DiBacco v. U.S. Army*, 795 F.3d 178, 198 (D.C. Cir. 2015). But the intelligence community comprises 17 specific agencies under the umbrella of the Office of the DNI—and CBP is not one of them. *See* 50 U.S.C. § 3003(4); *see also* E.O. No. 13470, 73 Fed. Reg. 45,325 (July 30, 2008). Indeed, CBP cites a number of cases to justify its reliance on § 3024(i)(1) but every single one features a member of the intelligence community invoking the statute. *DiBacco*, 795 F.3d 178 (CIA); *Larson*, 565 F.3d 857 (CIA and NSA); *Leopold v. CIA*, 380 F. Supp. 3d 14, 17 (D.D.C. 2019); *Lindsey v. FBI*, No. 16-2032 (CKK), 2020 WL 5593935 (D.D.C. Sept. 18, 2020). Plaintiffs have found no case where CBP has invoked § 3024(i)(1) as a withholding statute, and this Court should not be the first to allow it to do so.

### B. The Withheld Information Either Does Not Relate to Intelligence Sources and Methods or Has Been Officially Acknowledged.

Not only does CBP wrongly invoke § 3024(i)(1), it also does not explain why the withheld information is an intelligence source or method. *See Navasky v. CIA*, 499 F. Supp. 269,

---

to "facilitate the dissemination of information within government"—not to create "authority for the DNI . . . to establish a regime of undue government secrecy." 150 Cong. Rec. H11004 (daily ed. Dec. 7, 2004) (statement of Rep. Harman).

274 (S.D.N.Y. 1980) (agency "bears the burden of" demonstrating that information "logically fall[s] into the categories of 'intelligence sources and methods'"). CBP asserts that the document "contains information about . . . the Terrorist Screening Database (TSDB) and the Terrorist Identities Datamart Environment (TIDE)." Def's MSJ 19–20. But it does not take the required step of explaining why the specific information about these databases constitutes intelligence sources or methods. In fact, the surrounding context of certain redactions makes it highly unlikely that the obscured language has to do with intelligence sources or methods. Most notably, CBP has asserted Exemption 3 to withhold text on a page entitled "Watchlisting Authorities and Protections." Legal authorities and safeguards are not intelligence sources or methods, nor is there any evidence that they would reveal such information here.

Moreover, CBP may not invoke Exemption 3 with respect to TSDB and TIDE because the official acknowledgement doctrine bars it from doing so. Under this doctrine, the government may not invoke an exemption with respect to information it has already voluntarily disclosed. *See N.Y. Times Co. v. DOJ*, 756 F.3d 100, 114 (2d Cir. 2014). In *Wilson v. CIA*, 586 F.3d 171, 186 (2d Cir. 2009), the Second Circuit articulated a three-prong test for applying the doctrine to information in responsive records: The test is satisfied if the information "is as specific as the information previously released . . . , it matches the information previously disclosed, and was made public through an official and documented disclosure."[16]

The withheld information meets all three prongs of the test. Over the years, the government has released a range of official information describing TSDB and TIDE. *See, e.g.*,

---

[16] The *Wilson* court crafted this test with respect to classified information. Moreover, the Second Circuit has subsequently noted that while "*Wilson* remains the law of this Circuit, . . . a rigid application of it may not be warranted in view of its questionable provenance." *N.Y. Times Co.*, 756 F.3d at 120 n.19. Because the withheld information here is not classified, the context calls for an even more flexible application of the test.

Kim Decl. Exs. 6–8. Given the redactions, Plaintiffs cannot definitively assert that these prior disclosures match the obscured language, but the Watchlisting Reference Guide is unclassified and speaks at a high level of generality—giving a brief overview of topics like "What is Watchlisting" and "Reasonable Suspicion." Howard Decl. Ex. H, at 86–93. The government's prior disclosures regarding these databases are thus almost certainly more granular than the information CBP redacted from the Guide here.

## IV.     CBP MUST RELEASE SEGREGABLE, NON-EXEMPT INFORMATION.

Under FOIA, CBP must segregate and disclose non-exempt portions of individual records—*i.e.* any portion of a record that is not "inextricably intertwined" with properly exempt material. *ACLU v. FBI*, No. 11-cv-7562, 2015 WL 1566775, at *2 (S.D.N.Y. Mar. 31, 2015); 5 U.S.C. § 552(b). The sweeping nature of CBP's withholdings suggests that, at the very least, there may be reasonably segregable information that CBP has improperly withheld. But neither the declaration nor the Vaughn index provide any information about the segregability of the withholdings. *See Mead*, 566 F.2d at 261 ("[A]n agency should . . . describe what proportion of the information in a document is non-exempt and how that material is dispersed throughout the document."). CBP has therefore failed to bear its burden of establishing it has segregated and released non-exempt information.

**CONCLUSION**

For these reasons, Defendant's motion for summary judgment should be denied and Plaintiffs' cross-motion for summary judgment should be granted.

25

Dated: December 4, 2020                  Respectfully submitted,

                                         /s/ Scarlet Kim
Tarek Z. Ismail                          Scarlet Kim
CLEAR Project                            Patrick Toomey
CUNY School of Law                       American Civil Liberties Union
2 Court Square                               Foundation
Long Island City, NY 11101               125 Broad Street, 18th Floor
(718) 340-4141                           New York, NY 10004
tarek.ismail@law.cuny.edu                (212) 549-2500
                                         scarletk@aclu.org
                                         ptoomey@aclu.org

                                         Christopher Dunn
                                         Robert Hodgson
                                         New York Civil Liberties Union
                                             Foundation
                                         125 Broad Street, 19th Floor
                                         New York, NY 10004
                                         (212) 607-3300
                                         cdunn@nyclu.org
                                         rhodgson@nyclu.org

                                         *Counsel for Plaintiffs*

## <u>APPENDIX: INDEX OF PLAINTIFFS' CHALLENGED WITHHOLDINGS</u>

**I.   Documents Withheld in Full, Howard Decl. Ex. M**

| Document No. | Document Description |
|:---:|:---|
| 1 | Encounters at Ports of Entry Identify Individuals with Potential Links to International Terrorism |
| 4 | Tactical Terrorism Response Team Curriculum v2 |
| 5 | TTRT Officer Reference Job Aid 2020 |
| 9 | 2.CTD TTRT101 |
| 10 | Map of TTRT Locations |
| 11 | Culture and Religious Awareness Class |
| 14 | CND 101_20200205 |
| 15 | CTD 10 TTRT Orientation 20200304 |
| 16 | Memorandum – Importance of Targeting Rules |
| 18 | Muster – Updated Guidance [redacted] |
| 19 | Nomination Referrals |
| 27 | TOC Watchlisting Overview |
| 28 | TTP  [redacted] Presentation |
| 29 | TTRT [redacted] SOP [redacted] BSI 2018 |
| 30 | TTRT [redacted] Accomplishments |
| 32 | Enhanced Communication Course |

**II.   Redacted Documents**

| Howard Decl. Ex. D ||
|:---:|:---|
| **PDF Page No.** | **Document Description** |
| 10–11 | TTRT Refusals by Port of Entry |
| 12–16 | TTRT Encounters by Port of Entry |

| Howard Decl. Ex. F ||
|:---:|:---|
| **PDF Page No.** | **Document Description** |
| 1–3 | TTRT Encounters by Class of Admission |
| 4–7 | TTRT Withdrawals by Port of Entry |
| 8 | TTRT Expedited Removals by Port of Entry |

| Howard Decl. Ex. H ||
|:---:|:---|
| **PDF Page No.** | **Document Description** |
| 7–19 | CBP Directive No. [redacted], "Passenger Analytical Unit Procedures for Targeting High-Risk Travelers," |
| 20 | "TTRT – Tactical Terrorism Response Team" |
| 22–30 | PowerPoint, "Tactical Terrorism Response Team – [redacted]" |
| 32–35 | Area Port of [redacted] Standard Operating Procedures, "Tactical Terrorism Response Team (TTRT)" |
| 40–42 | Memorandum, "Tactical Terrorism Response Team Responsibilities" |

| 43–61 | PowerPoint, "Welcome to the TTRT presentation" |
| 62–80 | PowerPoint, "[redacted]" |
| 86–93 | "Watchlisting Reference Guide" |